**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | |
|---|---|
| In Re: ) | |
| ) | |
| ROBERT F. BRADY, Sr., ) | |
| ) | |
| Debtor, ) | Bankr. No. 18-71832 |
| ) | Adv. No. 19-7011 |
| THOMAS J. PLIURA, *et. al.*, ) | Dist. Ct. No. 20-1155 |
| ) | |
| Plaintiffs/Appellees, ) | |
| ) | |
| vs. ) | |
| ) | |
| ROBERT F. BRADY, Sr., ) | |
| ) | |
| Defendant/Appellant. ) | |

**OPINION AND ORDER**

This matter is now before the Court on Appellant/Cross-Appellee Robert F. Brady, Sr.'s, ("Brady") appeal and Appellees/Cross-Appellant Dr. Thomas J. Pliura and Pam Pliura's ("Pliuras") cross-appeal from the March 31, 2020, Order and Opinion issued by United States Bankruptcy Court Judge Mary P. Gorman. The Order sustained the Pliuras' Objection to the dischargeability of Brady's debt pursuant to 11 U.S.C. § 523(a)(2)(B) and approved the dischargeability of Brady's debt pursuant to 11 U.S.C. § 523(a)(2)(A). For the reasons set forth below, the Bankruptcy Court's March 31, 2020, Order is REVERSED in part and AFFIRMED in part.

**Background**

In 2010, businesses that Robert Brady and his brothers, Senator Bill Brady and Edward Brady, ("the Bradys") owned in Normal, Illinois were under incredible financial stress due to the housing bubble in America. (D. 5-2 at p. 15, p. 26). The Bradys' business portfolio included Brady

1

Homes, which built residential homes (*Id.* at pp. 9-10), and investment properties, including rental properties. (*Id.* at pp. 34-37). In an attempt to rectify their financial difficulties, Senator Brady reached out to a long-time family friend, Dr. Thomas Pliura, in mid-August 2010 for a loan of $1 million. (*Id.* at p. 63).

Dr. Pliura was on a fishing trip in Canada at the time, but he briefly spoke with Senator Brady who explained the Bradys' businesses were in financial trouble. *Id.* at p. 63. According to Dr. Pliura[1], the issue was further complicated by the fact that Senator Brady was running for Illinois governor and urgently needed the money to pay off contractors who were threatening to go to the public over the money owed. Senator Brady was concerned that this would adversely affect his political campaign. *Id.* at pp. 63-64.

When Dr. Pliura returned from Canada, he had an initial meeting with Senator Brady and then with Senator Brady and Edward Brady to determine how much money the Bradys needed to borrow. *Id.* at p. 64. Dr. Pliura agreed to make an initial "quickie loan" of $350,000.00. *Id.* at p. 45, p. 64. On September 22, 2010, Dr. Pliura e-mailed Edward Brady a promissory note for Edward and Robert Brady to sign. (D. 14-4 at p. 23). According to Dr. Pliura, he did not ask for Senator Brady's signature on the note due to concern that it could negatively impact his campaign. (D. 5-2 at p. 87). Although Robert Brady signed the $350,000.00 promissory note, he was not involved in any prior discussions with Dr. Pliura regarding the loan. *Id.* at 31.

Before Dr. Pliura loaned the remaining $650,000.00, he requested the Bradys provide collateral to secure the loan. *Id.* at 65. Based on the trial testimony, it appears that Senator Brady, Edward Brady, and Dr. Pliura handled the principal negotiations regarding the collateral to be

---

[1] Senator Bill Brady was never called as a witness to testify at trial. However, no objection was raised to Dr. Pliura's testimony regarding Dr. Pliura's initial conversation with Senator Brady regarding the circumstances of needing a quick loan.

2

used. *Id.* at 32. At trial Robert Brady testified that it was the Bradys' customary business practice to give potential lenders a spreadsheet that reflects the debt, market value, equity, and mortgage holder for property to be used as collateral. *Id.* at 27. Robert Brady presented no evidence these documents were provided to Dr. Pliura. There was also no evidence that Dr. Pliura tried to get any records or information regarding the properties to be used as collateral before issuing the loan.

Ultimately, the Rockingham Properties, which were rental income generating properties, were selected by Dr. Pliura as collateral for the loan. Dr. Pliura testified that he recalls telling his wife, "Well, at least we'll have the properties as rental income" if the loan goes south. *Id.* at 72. He further testified that Robert Brady verbally told him that the rental units produced $275,000.00 annually in income, and when he reviewed the numbers, he thought he would be in a stable financial position with a net profit of $200,000.00 annually[2]. *Id.* at 81.

Regarding Robert Brady's involvement with Dr. Pliura prior to closing on the loan on October 29, 2010, Brady testified: "[W]e didn't have a lot of conversation. I believe Dr. Pliura came in the office two or three times, spoke for 15 to 20 minutes and that was it." *Id.* at p. 40. On October 28, 2010, Dr. Pliura sent Robert Brady a blank e-mail titled "stuff" that had two attachments: (1) a blank promissory note; and (2) a blank security agreement prepared by Dr. Pliura to be filled in with the property selected as collateral. *Id.* at p. 24, p. 47. Brady responded and asked Dr. Pliura what they were going to do about the initial $350,000.00 note, and Dr. Pliura replied they would void it and roll it into the $1 million note. *Id.* at p. 50.

The Security Agreement and Promissory Note were prepared by Dr. Pliura, who was a medical doctor and attorney, although his law practice did not focus on real estate or commercial transactions. The Security Agreement stated it was between Robert Francis Brady and Edward

---

[2] There is no evidence of what numbers Dr. Pliura went through.

3

Patrick Brady ("Makers") and Thomas J. Pliura and Pam H. Pliura ("Lenders"). (D. 5-1 at p. 13). Again, Senator Brady's name was not included on these documents, but Dr. Pliura testified that he felt like he had loaned the money to Senator Brady, as well. (D. 5-2 at p. 71). During the closing, a copy of a 2002 appraisal of the Rockingham Properties was provided to Dr. Pliura to fill in the address information for the property into the Security Agreement. *Id.* at p. 51. An updated appraisal for the Rockingham Properties had been ordered two days prior, on October 27, 2010, but it was not available at the time the loan was closed. *Id.* at p. 53.

> Section 2 of the Security Agreement contained the following provisions:
>
> (c) Except for the security interest granted above, Makers stipulate and represent they are the sole, legal and equitable owner of the Collateral.
> (d) No other security agreement, financing statement, or other security instrument covering the Collateral exists.

(D. 5-1 at p. 14). When asked if he had read Section 2 of the Security Agreement before signing it, Robert Brady testified:

> My clear answer would be no because when I read it now, I look at it and say that it would be very misleading or false.
> … it was clearly described in all discussions that I had not just Dr. Pliura but with anybody else that there was debt on the properties that we had and that is why I speak of the equities to help protect individuals' interest that were coming [to] the table to help.

(D. 5-2 at pp. 25-26). On the other hand, Dr. Pliura testified that he witnessed the Bradys reading the Security Agreement prior to signing it and no one mentioned the terms in the Security Agreement were wrong. *Id.* at p. 71, p. 95.

The check for the "first and only" payment the Bradys made on the loan bounced. *Id.* at p. 72. As a result, approximately six months post-closing, Dr. Pliura contacted an attorney who did a title search and discovered that the Rockingham Properties were valued at around $1.6 million but were significantly mortgaged. *Id.* at p. 73. Dr. Pliura admitted that he had never done a title or lien

4

search on the Rockingham Properties when preparing the loan documents or prior to making the loan. *Id.* Dr. Pliura also realized that the Properties were not individually owned by Robert and Edward Brady but were owned by Pinehurst Development Inc. and Brew LLC, which were corporations owned by Bill, Edward, and Robert Brady.

Dr. Pliura then contacted Robert Brady, who was his "go-to guy," to figure out how he could get his loan repaid. At this point, Dr. Pliura requested the financial documents for the Rockingham Properties. Shortly thereafter, the Bradys did a deed in lieu of foreclosure of the Properties to the bank. *Id.* at p. 23. According to Robert Brady, prior to deeding the Properties to the bank, Senator Brady spoke with Dr. Pliura about doing a short sale of the Properties to him instead of selling them to the bank, but Dr. Pliura declined. *Id.*

Dr. Pliura provided the following testimony regarding his knowledge of the Brady's financial situation prior to making the $1 million loan:

> Atty: Dr. Pliura, talking about the reason for the loan… you've testified today that you were aware that the Bradys, I'm using them, Bob, Bill, and Ed Brady together, were in financial trouble. Is that – you were aware of that. Is that right?
>
> Dr. Pliura: Yes. Yes, I was.
>
> Atty: And that – you were aware of that in September and October 2010 when you made the loans.
>
> Dr. Pliura: *Absolutely I was.*
>
> Atty: Don't you think it—well, would you think it strange that someone in financial trouble would have a piece of commercial real estate free and clear of any mortgage?
>
> Dr. Pliura: …. they were good friends of mine. They – Bill was a – a good friend. Ed, Bob, all good friends. We'd go the country club together. And I assumed that this was just a little blip in their lives. *It was a troubling time for all contractors and real estate people because of this housing bubble…*. But I assumed that they would give me collateral that wasn't mortgaged over the value of the property. I didn't expect that.

*Id*. at pp. 96-97 (emphasis added).

Despite being aware of the troubled real estate market and knowing the Bradys' business was under financial distress, Dr. Pliura testified that he made the loan because he had been friends with the Bradys for years, knew Bill Brady was a senator and held him in high regard, and knew the Bradys as successful businessmen in the community and did not think the Bradys would look him in the eye and lie to him. *Id.* at p. 64.

In 2018, the Pliuras filed a lawsuit against Robert and Edward Brady in McLean County, Illinois in an attempt to recover the money they had loaned. On December 18, 2018, Debtor Robert F. Brady ("Brady") filed a voluntary Chapter 7 bankruptcy petition. On April 4, 2019, the Pliuras timely filed an adversary proceeding seeking a determination of the dischargeability of the debt owed to them by Brady. The Pliuras' first Amended Complaint alleged that the debt owed to them was obtained by fraud and misrepresentation and was therefore nondischargeable under 11 U.S.C. § 523(a)(2). According to the Pliuras, Brady obtained a $1 million loan from them by misrepresenting the nature and value of his purported interest in real estate that was used to secure the loan.

The Bankruptcy Court agreed with the Pliuras that Brady's debt was nondischargeable under 11 U.S.C. § 523(a)(2)(B), but not under 11 U.S.C. § 523(a)(2)(A). Brady filed an appeal disputing the Bankruptcy Court's finding regarding nondischargeability of his debt under 11 U.S.C. § 523(a)(2)(B), and the Pliuras cross-appealed regarding the Bankruptcy Court's finding of dischargeability of the debt under 11 U.S.C. § 523(a)(2)(A). This Order follows.

**Analysis**

"The distinguishing feature of a Chapter 7 proceeding for the individual debtor is the discharge: after surrendering his non-exempt property for the benefit of his creditors, the debtor is

discharged from what remains of most of the debts he owed as of the date the bankruptcy petition was filed." *Matter of Turner,* 156 F.3d 713, 717 (7th Cir. 1998). The primary purpose of the bankruptcy discharge is to give the debtor a "fresh start." *In re Chambers,* 348 F.3d 650, 653 (7th Cir. 2003). The benefits of this "fresh start" however, are limited to the "honest but unfortunate debtor." *Grogan v. Garner,* 498 U.S. 279, 286-87 (1991). The Bankruptcy Code provides for exceptions when the debtor has been less than honest.

The Pliuras contend that two provisions preclude discharge of the debt owed to them. First, they argue that 11 U.S.C. § 523(a)(2)(B) bars discharge because Brady submitted a materially false financial statement made with intent to deceive that the Pliuras reasonably relied on when they extended financing to the Bradys. Second, in the alternative, the Pliuras argue that the Bankruptcy Court should have granted an exception to discharge under 11 U.S.C. § 523(a)(2)(A), which bars discharge of debts resulting from false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's financial condition.

This Court reviews the Bankruptcy Court's legal conclusions de novo. *In re Worldwide, Ltd.,* 139 F.3d 574, 576 (7th Cir. 1998). A bankruptcy court's interpretation of the Bankruptcy Code is a legal conclusion that a district court reviews de novo. *In re Birkenstock,* 87 F.3d 947, 951 (7th Cir. 1996). In contrast, a district court reviews the bankruptcy court's finding of fact for clear error. *Id.* That is, this Court will only reverse the Bankruptcy Court's factual findings when it is "left with the definite and firm conviction that a mistake has been committed." *In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir. 1994) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573 (1985)).

In keeping with the main purpose of the federal bankruptcy system "to aid the unfortunate debtor by giving him a fresh start in life, free from debts, except of a certain character," *Stellwagen*

7

*v. Clum,* 245 U.S. 605, 617 (1918), exceptions and objections to discharge are to be construed strictly against the creditor and liberally in favor of the debtor. *Meyer v. Rigdon,* 36 F.3d 1375, 1385 (7th Cir. 1994).

### A. 11 U.S.C. § 523(a)(2)(B) does not preclude discharge.

Section 523(a)(2)(B) of the Bankruptcy Code provides that a debtor is not discharged from any debt "for money, property, services, or an extension, renewal or refinancing for credit, to the extent obtained by" a statement in writing (1) that is materially false; (2) respecting the debtor's financial condition; (3) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied, and (5) that the debtor caused to be made or published with intent to deceive. 11 U.S.C. § 523(a)(2)(B). The creditor bears the burden of proving by a preponderance of the evidence that a debt meets the statutory requirements for an exception to discharge. *See Grogan,* 498 U.S. at 291. Therefore, the Pliuras have the burden to prove that the Security Agreement drafted by Dr. Pliura and signed by Brady was: (1) a materially false statement; (2) respecting Brady's financial condition; (3) upon which the Pliuras reasonably relied; and (4) made with the intent to deceive the Pliuras. *See* 11 U.S.C. § 523(a)(2)(B). The Bankruptcy Court concluded that the Security Agreement was a materially false statement, that the Pliuras reasonably relied upon, and further, that Brady submitted (signed) the Security Agreement with the intent to deceive.

1. **Materially False Statement**

Brady first argues that the Bankruptcy Court erred in applying the "substantial untruth" test rather than the "but-for" test in determining materiality. The Seventh Circuit has not given clear guidance regarding the materiality element of § 523(a)(2)(B). The "but-for" test is frequently used, under which "a misrepresentation is material only if the creditor would not have advanced funds

8

but for the debtor's misrepresentation." *Selfreliance Fed. Credit Union v. Harasymiw (Matter of Harasymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990). The Seventh Circuit has described the "but-for" test as a "recurring guidepost" in the analysis but has not decided whether a creditor must prove but-for causation to establish an exception to discharge under § 523(a)(2)(B). *Id.* (quoting *Matter of Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985)). An alternative, less stringent test treats any "important or substantial untruth" as materially false. *Id.* A false statement that satisfies this test is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Bryson*, 187 B.R. at 962 (quoting *Jordan v. Southeast Nat'l Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir.1991)).

This Court does not need to decide today whether a "but-for" analysis is an essential part of § 523(a)(2)(B)'s materiality argument. Brady's appeal on this issue is fruitless even using the more stringent "but-for" test. It is undisputed that the Security Agreement contained false information: (1) that Robert and Edward Brady were the "sole, legal and equitable owners" of the Rockingham Properties used as collateral; and (2) that no other security agreement, financing statement, or other security instrument covering the collateral existed.

First, this Court has no reason to disagree with the Bankruptcy Court's finding that if the Pliuras had known the extent the Properties were mortgaged, they would not have made the loan under both the "but-for" and "substantial untruth" test. Regarding the statement in the Security Agreement that "no…other security interest covering the Collateral exists," Brady testified that this statement was "very misleading or false" and that the Properties described in all discussions with Dr. Pliura that there was debt on them, which is why they spoke of the equities to help protect his interests. (D. 5-2, pp. 26). Dr. Pliura, on the other hand, denied he had been told there were any

mortgages on the property and claimed he would not have made the loan had he known the collateral did not protect him. *Id.* at pp. 68-69.

This Court disagrees with the finding that had the Pliuras known the Rockingham Properties were owned by corporations that the Brady brothers owned, rather than by Robert and Edward Brady personally, the Pliuras would not have made the loan. This finding is permissible because the Court is required to view the evidence favorably toward Brady. Dr. Pliura testified that he did not recall having a discussion with the Bradys about whether they personally owned the property or if it was owned by a corporation. *Id.* at p. 86. Brady admitted at trial that at the time the Security Agreement was signed, the Rockingham Properties used as collateral were owned by Pinehurst Development LLC and Brew Inc., of which Bill, Robert, and Edward Brady were each one-third owners. While it was a false statement that Robert and Edward Brady personally were the "sole, legal, and equitable" owners of the Rockingham Properties, Dr. Pliura knew Bill Brady was also an owner of the Properties, but was fine with not including Senator Bill Brady's name or requiring his signature on the documents. (D. 5-2, p. 87). This is evidenced by Dr. Pliura's testimony that he felt he had just made a loan to Bill Brady, even though his name was not on the documents. *Id.* at 71.

Under these facts, the Court finds the Pliuras have failed to satisfy both the "but-for" and "substantial untruth" tests for materiality, that they would not have made the loan based on the fact that Robert and Edward did not personally own the Rockingham Properties, since Dr. Pliura knew that statement was false at the time the Security Agreement was signed and still proceeded with the loan.

Despite this Court's disagreement with the Bankruptcy Court's finding regarding materiality as to the statement regarding ownership of the Rockingham Properties, Brady's

10

challenge to the Bankruptcy Court's finding on materiality fails because the separate statement that no other security interest existed on the collateral was not clearly erroneous.

    2. **Reasonable Reliance**

Brady also argues that, contrary to the Bankruptcy Court's findings, the Pliuras did not reasonably rely on the Security Agreement Dr. Pliura drafted when he and his wife decided to extend a loan to the Bradys. The Bankruptcy Court focused on the fact that the Pliuras were not traditional lenders and found it would be unfair to evaluate their reliance as though they were commercial bankers. As a result, despite "red flags" raised by Brady's attorney at trial surrounding the Bradys' financial condition, the Bankruptcy Court appeared to evaluate the evidence in the light most favorable to the Pliuras and ultimately found that it would be "wrong to blame the victim" and weighed heavily Dr. Pliura's testimony that he had been friends with the Bradys for years; their wives were friends; he knew that Bill Brady was a state senator and held Senator Brady in high regard; he knew the Bradys as successful businessmen in the community; and despite knowing the Bradys' businesses were under financial distress, had no reason to think the Bradys would look him in the eye and lie. *Id.* at p. 64.

Reasonable reliance must be evaluated in the context of the totality of the circumstances and should be determined on a case-by-case basis. *In re Bonnet,* 895 F.2d 1155, 1157 (7th Cir. 1989). During this review, the Seventh Circuit has recognized that courts should not "undertake a subjective evaluation and judgment of a creditor's lending policy and practices," *In re Garman,* 643 F.2d 1252, 1256 (7th Cir. 1980), nor should courts use the reasonable reliance requirement to "second-guess a creditor's lending decision." *In re Morris,* 223 F.3d at 553. Furthermore, the Seventh Circuit has held, "the concept of reasonable reliance does not generally require an investigation prior to entering into agreements with prospective debtors." *Id.* at 554. A lender,

however, cannot ignore red flags and later expect a court to grant an exception to the debtor's discharge. *In re Bogstad,* 779 F.2d 370, 372 n.4 (7th Cir. 1985). Reliance may also not be reasonable if a lender "possesses information sufficient to call the representation into question." *Mayer v. Spanel Int'l, Ltd.,* 51 F.3d 670, 676 (7th Cir. 1995).

While the Supreme Court has not exhaustively explored the facts that might give rise to a finding of reasonable reliance, the Seventh Circuit in *In re Morris,* 223 F.3d 548, 554 (7th Cir. 2000) cited to a Fifth Circuit case, *In re Coston*, 991 F.2d 257, 261 (5th Cir. 1991), which stated that when determining reasonable reliance:

> "[t]he bankruptcy court may consider, among other things: whether there had been previous *business* dealings with the debtor that gave rise to a relationship of trust; whether there were any 'red flags' that would have alerted an 'ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representation." (emphasis added).

Without a more specific definition of "reasonable reliance" or any guidance on whether non-commercial lenders should be treated differently, it is a difficult decision as to whether there was "reasonable reliance" as contemplated by § 523(a)(2)(B)(iii) in this case. However, because exceptions to discharge are "strictly construed against the objecting creditor and in favor of the debtor" as required by applicable law (*Meyer,* 36 F.3d at 1385; *In re Morris,* 223 F.3d at 552), this Court believes the Bankruptcy Court clearly erred in finding that the Pliuras met their burden of proof by a preponderance of the evidence that they reasonable relied on the terms in the Security Agreement, which Dr. Pliura personally prepared, under the totality of the circumstances.

This Court first recognizes and agrees that weight should be given to the personal relationship between the Bradys, including the debtor, and the Pliuras; however, there is no evidence that there had been any past *business* relationship between the parties. Additionally, by Dr. Pliura's own admission, he was "absolutely aware" that the Bradys and their businesses were

in financial trouble in September and October 2010. (D. 5-2 at p. 96). Dr. Pliura further testified that he knew "it was a troubling time for all contractors and real estate people because of [the] housing bubble." *Id.* at p. 97.  This is significant because the property he selected as collateral was one of the Bradys' rental-income properties, which he knew was a part of the Bradys' real estate business.  The same business Dr. Pliura knew was under financial duress when he made the loan. That fact alone is a red flag which would trigger an obligation for Dr. Pliura to conduct even a minimal investigation into the Rockingham Properties, such as performing a title or lien search of the property, requesting the properties' financial statement, or obtaining an updated appraisal prior to loaning $1 million.

The Court also finds the Bankruptcy Court erred in using the "don't blame the victim approach", simply due to the fact Dr. Pliura is a highly educated individual rather than a traditional commercial lender. Doing some investigation prior to lending $1 million when red flags exist is not only reasonable, but common sense. However, Dr. Pliura did absolutely nothing to ensure his loan was secure, despite being aware of the financial climate surrounding real estate and the Bradys' dire financial situation.

Under these circumstances, this Court finds that the Bankruptcy Court clearly erred in finding there was reasonable reliance by the Pliuras.

    3. **Intent to Deceive**

A creditor can prove intent to deceive through direct evidence. *In re Sheridan,* 57 F.3d 627, 633 (7th Cir. 1995). In addition, intent to deceive may be proved circumstantially and may be inferred from a false representation that the debtor knows or should know will induce another to make a loan. *Id.* An intent to deceive may be inferred if: (1) the statement is materially false; (2) the debtor knew his statement was false or was reckless in making the false statement; and (3)

knew or should have known that the lender would be induced to make the loan as a result of the materially false statement. *In re Martin*, 306 B.R. 605-06 (Bankr. C.D. Ill. 2004). A bankruptcy court's determination that a debtor did not act with the intent to deceive is a finding of fact that a district court reviews for clear error. *Id.*

The Bankruptcy Court found each of these factors proven, because: (1) the Security Agreement was materially false because it misstated the true owners of the Rockingham Properties and that they were not encumbered by mortgages; (2) if he read the Security Agreement, Brady knew or should have known that these statements were false; and (3) Dr. Pliura testified that he would not have issued the loan without collateral.

The question of intent to deceive is "intensely one of fact, making the debtor's credibility a very important factor." *In re Phillips,* 637 B.R. at 645. Mindful of the deferential standard of review and the knowledge that the Bankruptcy Court had the opportunity to observe the witnesses' testimony, this Court does not find the Bankruptcy Court's conclusion clearly erroneous. Dr. Pliura testified at trial that he saw all the Bradys, including the Debtor, read and review the final documents before the Debtor signed them. The Bankruptcy Court did not find the Debtor's testimony that he did not read the documents credible. Furthermore, the Bankruptcy Court found key to the issue of the Debtor's intent to deceive was Dr. Pliura's unrebutted testimony that when he asked for the wives of the Debtor and his brother to sign the Note, he was told those signatures were unnecessary because the Rockingham Properties provided coverage for the $1 million loan and that the Pliuras were fully protected.

Therefore, this Court does not find clearly erroneous the Bankruptcy Court's conclusion that Brady acted with intent to deceive the Pliuras when he signed the Security Agreement that

contained false statements regarding the Rockingham Properties, specifically that they were not previously mortgaged.

### B. 11 U.S.C. § 523(a)(2)(A) does not preclude discharge.

The Pliuras argue in the alternative, that if Brady's debt is dischargeable under 11 U.S.C. § 523(a)(2)(B), then 11 U.S.C. § 523(a)(2)(A) precludes discharge. Section 523(a)(2)(A) governs debts arising from "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's… financial condition." Section 523(a)(2)(B) addresses the exception carved out from (a)(2)(A), requiring that such a statement be in writing in order to form the basis for a nondischargeable debt. *See* 11 U.S.C. § 523(a)(2)(B); *see also In re Cassel,* 322 B.R. 363, 371 (Bankr. C.D. Ill. 2005). The two provisions are often regarded as mutually exclusive. *See In re Cassel,* 322 B.R. at 371 (citing *In re Ophaug,* 827 F.2d 340 (8th Cir. 1987)).

The Pliuras argue the Bankruptcy Court erred in treating § 523(a)(2)(A) and (B) as mutually exclusive on the grounds that the misrepresentations made by Brady, both orally and in writing, were sufficient to establish false pretenses, false representations, or actual fraud warranting a denial of discharge under both 11 U.S.C. § 523(a)(2)(A). The Bankruptcy Court found all misrepresentations, both oral and in writing, were about the Bradys' "financial condition" and therefore were not actionable under § 523(a)(2)(A).

The Pliuras fail to point to any misrepresentation made by the Bradys that does not have to do with their "financial condition." "The text of § 523(a)(2) plainly heightens to bar discharge when the fraud at issue was effectuated via a 'statement respecting the debtor's financial condition.'" *Lamer, Archer, & Cofrin, LLP v. Appling*, 138 S.Ct. 1752, 1763 (2018). The heightened requirements for nondischargeability under § 523(a)(2)(B) were intended to address such statements. *Id.*

15

Therefore, this Court affirms the Bankruptcy Court's finding that 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(2)(B) are mutually exclusive and does not find clearly erroneous the Bankruptcy Court's finding that the Debtor's misrepresentations had to do with his financial condition and were therefore not actionable under § 523(a)(2)(A).

**Conclusion**

As I stated earlier, this case poses a difficult decision as to whether the Pliuras reasonably relied on the false representations of the Bradys when agreeing to lend them one million dollars. Judge Gorman is an excellent Bankruptcy Judge, and I do not lightly reverse her findings on this issue. Also, it is clear from the record that the Bradys took advantage of their longstanding friendship with the Pliuras when providing financial information that was clearly false.

But in applying the applicable Bankruptcy law to the facts in this record—as I must (that exceptions to discharge are strictly construed against the objecting creditor and in favor of the debtor (*see Meyer,* 36 F.3d at 1385; *see also In re Morris,* 223 F.3d at 552)—this Court believes it was clear error for the Bankruptcy Judge to find that the Pliuras reasonably relied on the false representations of the Bradys concerning the collateral for the loan. Even a simple title search would have quickly established that the property was heavily indebted.

For the reasons stated above, the Court REVERSES the Bankruptcy Court's March 31, 2020, Order and Opinion regarding Count II and AFFIRMS regarding Count I.

Entered on November 5, 2020.

/s/ Michael M. Mihm
Michael M. Mihm
United States District Judge